UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:17-cr-00041-TLS-SLC |
| | ) | |
| MICHAEL SMITH | ) | |
| | ) | |

REPORT AND RECOMMENDATION

Before the Court is a motion to suppress all evidence (DE 20) filed by Defendant Michael

Smith.  Smith seeks to suppress evidence discovered by police officers during an encounter on

June 17, 2017, because all of the evidence was obtained as a result of violations of his Fourth

Amendment rights.  After considering the evidence and argument submitted by the parties in this

matter, I RECOMMEND that Smith's motion to suppress all evidence be DENIED.

I.  BACKGROUND

On July 26, 2017, Smith was indicted by way of a single-count indictment and charged

with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (DE 1).  On

August 4, 2017, Smith pleaded not guilty.  (DE 12).  On September 18, 2017, Smith filed the

instant motion.  (DE 20).  This matter was referred to the undersigned Magistrate Judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  (DE 22).  An evidentiary hearing

on this matter was held on October 17, 2017.  (DE 24).  On December 18, 2017, Smith filed a

post-hearing brief in support of his motion to suppress.  (DE 29).  The Government filed its

response on January 18, 2018.  (DE 30).  Smith filed his reply brief on February 5, 2018.  (DE

31).

II.  FINDINGS OF FACT

At the evidentiary hearing, the Government offered the testimony of Fort Wayne Police

Department ("FWPD") Officer Tom Vachon ("Officer Vachon"), FWPD Officer David Wilkins

("Officer Wilkins"), and FWPD Detective Marc DeShaies ("Detective DeShaies").[1]  (DE 28,

Transcript of Motion to Suppress Hearing ("Tr.") 2).  Smith did not offer the testimony of any

witnesses and did not meaningfully contest the officers' testimony in any way, and I FIND their

testimony to be credible.

### A.  The 911 Calls

On the evening of June 17, 2017, two persons at the same address on Brown Street in

Fort Wayne called 911 to report an armed person in the area.  (Ex. A; Tr. 12, 71).  Both callers

identified themselves by their first names and gave the same addresses to the 911 receptionists.

(Ex. A at 00:45, 2:50).  The first caller gave an eyewitness account that a black male in a white

shirt and blue jean shorts was walking a dog, behaving erratically, and threatening people with a

gun.[2]  (Ex. A at 00:45-1:38; Ex. 10).  The suspect had apparently been arguing with residents in

the neighborhood about his dog.  (Ex. A at 00:45-1:38; Ex. F at 1; Ex. 10).  The other caller did

not give an eyewitness account, and repeated information given by children:  A man armed with

a gun had been arguing and threatening people in the area.  (Ex. A at 3:30-4:45).  The caller

claimed that the suspect was traveling eastbound on Brown Street towards Brooklyn Avenue.

(Ex. A at 5:35-5:45).  Later in that call, another person took over talking to 911 and requested

immediate police assistance.  (Ex. at 5:50-6:40).  This last tipster described the suspect as an

armed black male wearing a white and grey shirt with a Chicago Bulls logo, walking a dog down

---

[1] On the night of June 17, 2017, all the officers in this case were wearing full police uniforms and driving fully marked police vehicles.  (Tr. 8, 37-38, 70).  Officer Vachon has been a police officer with the FWPD for 24 years, and has been a police officer for 29 years total.  (Tr. 8, 24).  Officer Wilkins has been a police officer with the FWPD for approximately 14 and a half years.  (Tr. 37).  Detective DeShaies has been an officer with the FWPD for 13 years, and has spent two years in the gang and violent crime unit.  (Tr. 69).  Detective DeShaies has previously been certified as a drug recognition expert by the FWPD and is able to detect signs of intoxication.  (Tr. 69).

[2] After Smith was incarcerated, Officer Wilkins followed up with this caller based on the information she provided.  (Tr. 66).

Brown Street towards Brooklyn Street, and stated that the suspect had threatened to come back. (Ex. A at 5:25-6:40; Ex 10).  The tipster also stated that the suspect was intoxicated.  (Ex. A. at 7:00-7:12).

## B.  The Officers' Encounter with Smith

Following the 911 calls, FWPD sent out two "[p]arty armed" dispatches.  (Tr. 39; Ex 10). The first dispatch described the suspect as an intoxicated black male, in a white shirt and blue jean shorts, walking a dog on Brown Street heading towards Brooklyn Avenue, and threatening people with a gun.  (Ex. A at 8:28-9:20; Ex. F; Ex. 10; Tr. 9-10, 34, 40, 71-72, 88-87).  Officer Vachon received this information and immediately set out to find the suspect.  (Tr. 9).  In the second dispatch, the description was modified:  the suspect was wearing a white and grey shirt with a Bulls logo.  (Ex. 10; Tr. 24).  Officer Vachon arrived in the area about four minutes after receiving the dispatch and observed a black male, wearing a white-colored shirt, walking a white dog and entering an alley off of Brown Street, close to Bevel Avenue.  (Tr. 10-11; *see* Ex. 1). This person turned out to be Smith.  (Tr. 14).  Officer Vachon did not know where Smith had come from and could not see whether there was a Bulls logo on his shirt.  (Tr. 11, 22).

Officer Vachon stopped, called out his location to other officers and dispatch, and exited his squad car.  (Tr. 13).  After Officer Vachon initially saw Smith, he lost visual of him for about 20 seconds when Smith entered the alley.  (Tr. 13, 24).  Smith saw Officer Vachon and continued into the alleyway to avoid him and the other officers.  (Ex. 9, July 26, 2017, at 1:17 p.m., at 6:10-6:20; Tr. 42).  Detective DeShaies, Officer Wilkins, and Officer Shefferly arrived shortly after Officer Vachon, and the four officers followed the suspect into the alley on foot. (Tr. 13, 33).  Initially, Smith continued to walk away from them.  (Tr. 43).  When Detective DeShaies arrived he equipped his FWPD-issued shotgun as a precaution against Smith's dog, in

3

case it posed a threat, but kept the shotgun pointed at the ground at first.  (Tr. 73, 92).  The other officers approached with their pistols in a low-ready position because they believed that Smith matched the description of the suspect in the dispatches and was armed and dangerous.  (Tr. 14-15, 32, 42-43; *see also* Tr. 74).  Because the officers were between 50 and 100 feet away from Smith, they could not detect whether Smith exhibited normal indicia of intoxication (*e.g.*, slurred speech, odor of alcohol, blood shot eyes, disheveled clothes, etc.).  (Tr. 25-26, 56, 94).  The officers could see that Smith was not wearing blue jean shorts or a white shirt; rather, he was wearing long blue jean pants and a grey and white shirt.  (Tr. 24, 39-40, 73-74, 90-91).  At that time, the officers could not see whether Smith's shirt had a Bulls logo.[3]  (Tr. 24, 39-40, 73-74, 90-91).

Shortly after entering the alley, Officer Vachon yelled, "Stop!  Police!"  (Ex. 5 at 4:56; Tr. 13-14, 27).  At that point Smith stopped, and the officers testified that he was not free to leave.  (Tr. 27, 59, 93).  As the officers closed the distance between themselves and Smith they could see the Bulls logo on his shirt.  (Tr. 14, 73).  Detective DeShaies initially intended to conduct an investigatory interview with Smith to see if he was the person described in the 911 calls, get his version of events, and to make sure that Smith did not have a gun on him.  (Tr. 102).  However, Detective DeShaies abandoned this plan because Smith did not cooperate with the officers.  (Tr. 102).

Smith did not have complete control over his dog, which started barking and behaving aggressively towards the officers.  (Tr. 41, 60-61, 75).  To ensure their safety, the officers

---

[3] Detective DeShaies testified that prior to entering the alleyway he received the second dispatch that described the suspect as wearing a white and grey shirt.  (Tr. 88).  However, Detective DeShaies testified that he was looking for a suspect in a white shirt when he entered the alleyway.  (Tr. 89).  This distinction, as discussed *infra*, is not material, and it is worth noting that Smith's shirt was white and grey with a Bulls logo on the front. (Ex. 6).

ordered Smith to tie the dog's leash to a nearby fence. (Ex. 5 at 4:15-4:25; Tr. 13-14, 41, 44-45, 75; *see also* Ex. 8). Smith did not tie his dog up when commanded and failed to do so for approximately three to three-and-a-half minutes (Ex. 5 at 5:00-8:30), despite the officers threatening to tase Smith and shoot his dog if he did not follow their instructions (Ex. 5 at 7:55; Ex. 8 at 1:05, 2:35; Tr. 94-95). In fact, Smith argued with the officers to avoid tying up his dog, which Detective DeShaies found suspicious. (Tr. 76). The officers suspected that Smith was intoxicated and stalling; he mumbled and slurred his speech, he swayed and stumbled, he did not appear completely coherent, he had a blank gaze, and his demeanor did not change despite the tense nature of the encounter. (Tr. 16, 43, 76, 78, 95-96).

The officers continued to close the distance to about eight to 10 feet. (Tr. 78). Officer Wilkins and Detective DeShaies became concerned that Smith was armed because they observed something that looked like the grip of a pistol in Smith's left pant pocket. (Tr. 44, 61-62, 76, 80). Officer Shefferly was providing cover with a taser aimed at Smith. (Tr. 78).

Eventually, Smith loosely tied his dog to a fence. (Tr. 79). The officers then ordered Smith to lift up his shirt to show that he had no weapons in his waist band, walk towards them and away from the dog, and get on his knees. (Ex. 5 at 8:40-9:10; Ex. 8 at 3:15-3:24; Tr. 45, 99). Smith was not compliant with these orders; he did not create a safe amount of distance between himself and the dog and appeared to use the dog to create a barrier between himself and the officers, which gave the officers further concern. (Ex. 5 at 8:40-10:20; Tr. 80-81, 45, 99-100). The officers also ordered Smith to put his hands on his head and to keep them there. (Ex. 5 at 10:11; Ex. 8 at 4:23-5:00; Tr. 15, 46). However, Smith did not adhere to this order either and repeatedly dropped his hands to his side despite warnings that he would be tased if he did so. (Tr. 15, 27, 46, 48). After Smith's repeated refusals to listen to the officers' instructions and

warnings, and because the officers were concerned that Smith was reaching for a weapon,

Officer Shefferly tased Smith for about five seconds while Officer Wilkins gained physical

control of Smith.[4]  (Tr. 15, 27, 46, 48).

At that point, Officer Wilkins could smell alcohol on Smith and intended to arrest Smith

for publication intoxication.  (Tr. 48; *see* Tr. 83-84).  Officer Wilkins then frisked Smith and

believed doing so was justified as a search incident to arrest or a pat down pursuant to reasonable

suspicion that Smith was the suspect in the 911 calls.  (Tr. 47-49, 54; *see also* Tr. 83-84).  Officer

Wilkins felt an object that he believed was a gun grip in Smith's front left pant pocket, opened

up the pocket, and found two fully loaded Smith and Wesson 40 caliber magazines.  (Tr. 16, 47,

81).  Based on his experience, Officer Wilkins believed that Smith also had a gun.  (Tr. 47).

The officers searched the area for the matching gun, and shortly after finding the

magazines, the officers found a Smith and Wesson 40 caliber pistol and a holster on the lawn of

a nearby house, close to some trashcans.  (Ex. 5 at 13:40; Ex. 8 at 6:20-6:30; Ex. 4; Tr. 16-17,

82, 84).  Detective DeShaies noted that the ground was covered in dew, but the firearm was not.

(Tr. 82).  Detective DeShaies also interviewed a resident of the property where the gun was

found (Ex. 8 at 8:23-25:55), who claimed that she had taken the trash out about three hours

earlier and had not seen a gun close to the trash cans.  (Ex. F at 2; Ex. 8 at 25:50-26:00).

Smith did not have a valid permit for a handgun.  (Tr. 51).  Officer Wilkins contacted

dispatch who informed him that Smith had been convicted of a felony involving domestic battery

and was prohibited from carrying handgun.  (Tr. 51).  Officer Wilkins placed Smith under arrest

for being a felon in possession of a handgun and carrying a handgun without a license with a

previous felony conviction in the past 15 years.  (Tr. 51).  Smith was not charged with public

---

[4] Detective DeShaies was able to calm the dog down without harming it.  (Tr. 81).

intoxication, because, in Officer Wilkins's experience, that charge would have likely been dismissed later.  (Tr. 51-52).

### C.  After the Arrest

Detective DeShaies transported Smith to the Allen County Jail.  (Tr. 62).  While in Detective DeShaies's vehicle, Smith continued to be uncooperative and exhibit signs of intoxication.  (Ex. 10 at 3).  In Detective DeShaies's experience, the encounter with the officers and the taser would not inhibited Smith's understanding of events.  (Tr. 97-98).

Following Smith's incarceration, he conducted a number of telephone calls with his girlfriend, which were recorded.  In the phone calls, Smith admitted that he had been intoxicated during the encounter with the officers.  (Ex. 9, time stamped July 26, 2017, at 1:17 p.m., at 11:15-11:20).[5]  Smith also admitted that when he initially saw the officers that night, he went into the alleyway in order to avoid them.  (Ex. 9, time stamped July 26, 2017, at 1:17 p.m., 6:00-6:17; Ex. 9, time stamped July 26, 2017, at 1:19 p.m., at 9:15-9:22).  Smith confirmed that prior to being stopped he threw the gun away to avoid the officers finding it.  (Ex. 9, time stamped July 26, 2017, at 1:17 p.m., at 13:10-14:38).  Smith also explained to his girlfriend that he was stalling the officers in the alleyway, in hopes that she would come find him and take the gun away before the officers found it.  (Ex. 9, time stamped July 26, 2017, at 1:18 p.m., at 8:00-8:10; Ex. 9, time stamped July 26, 2017, at 1:19 p.m., at 9:15-9:20).

### III.  DISCUSSION

### A.  Legal Standard

"The Fourth Amendment to the Constitution of the United States prevents the Government from conducting unreasonable searches and seizures."  *United States v. Whitaker*,

---

[5] Because Exhibit 9 contains numerous audio files, they are distinguished by their time stamp.

546 F.3d 902, 906 (7th Cir. 2008) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see* U.S. Const. amend. IV.  Two categories of seizure implicate the Fourth Amendment:  an arrest and an investigatory stop.  *United States v. Parker*, No. 3:09-CR-148 JD, 2010 WL 2943649, at *2 (N.D. Ind. July 21, 2010) (quoting *United States v. Mancillas*, 183 F.3d 682, 695 (7th Cir. 1999)).  Under *Terry v. Ohio*, 392 U.S. 1 (1968) and its successors, a stop supported by reasonable articulable suspicion "'reasonable' under the fourth amendment."  *United States v. Wooden*, 551 F.3d 647, 649 (7th Cir. 2008) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Chaidez*, 919 F.2d 1193 (7th Cir. 1990)).  "Reasonable suspicion is less than probable cause but more than a hunch."  *United States v. Maclin*, 313 F. App'x 886, 888 (7th Cir. 2009) (citing *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)).  The reasonable suspicion determination is based on:

> [T]he totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. . . .  Further, we recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play.

*Lawshea*, 461 F.3d at 859 (citations omitted).

For an encounter to "remain a valid Terry stop, the stop must be 'limited in scope and execution through the least restrictive means reasonable.'"  *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008)).  If a *Terry* stop is unreasonably intrusive then, "while technically not an 'arrest,' it may be 'tantamount' to an arrest" requiring probable cause."  *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Dunaway v. New York*, 442 U.S. 200, 212-16 (1979)).

**B.  Analysis**

Smith argues that he was seized in violation of his Fourth Amendment rights because:

(1) the 911 calls and the officers' observations did not create reasonable suspicion that Smith

was committing, had recently committed, or was about to commit a crime; and (2) Smith was *de

facto* arrested without probable cause from the outset of the encounter. As discussed below,

neither argument is persuasive.

> 1. The Officers Had Reasonable Suspicion to Conduct a *Terry* Stop

The analysis begins by evaluating "the reasonableness of the officers' initial stop of

[Smith]." *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir. 1993) (citing *United States v.*

*Sharpe*, 470 U.S. 675, 682 (1985); *Terry*, 392 U.S. at 20). "Under most circumstances, when an

officer observes someone who fits the description given by a dispatcher of a person involved in a

disturbance and the observation is near in time and place to the disturbance, the officer may stop

the suspect." *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008) (citing *United States v.*

*Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

However, an anonymous tip of "general criminality" is "insufficient to establish

reasonable suspicion." *United States v. Fields*, 373 F. App'x 624, 627-28 (7th Cir. 2010)

(quoting *Florida v. J.L.*, 529 U.S. 266, 271 (2000)). Tips containing "specific information

regarding an ongoing emergency . . . justify an immediate police response" and do not require

additional pre-response verification. *Id.* at 628 (citing *United States v. Wooden*, 551 F.3d 647

(7th Cir. 2008); *Hicks*, 531 F.3d at 558-59); *see Whitaker*, 546 F.3d at 909; *United States v.*

*Drake*, 456 F.3d 771, 774-75 (7th Cir. 2006) (collecting cases). A tip is generally presumed to

be reliable, particularly if the tipster identifies him or herself by giving a name, a telephone

number where the tipster can be reached, or an address. *See Fields*, 373 F. App'x at 627;

*Wooden*, 551 F.3d 647; *Whitaker*, 546 F.3d at 909; *Hicks*, 531 F.3d at 559-60; *Drake*, 456 F.3d

at 775; *Carr v. Jehl*, No. 13 CV 6063, 2015 WL 362089, at *4 (N.D. Ill. Jan. 28, 2015).

Smith argues that the officers did not have reasonable suspicion to conduct a *Terry* stop

because: (1) the 911 callers were not sufficiently reliable; and (2) Smith did not resemble the

person described in the 911 calls.[6]

First, Smith argues that neither 911 caller was reliable because they were essentially

anonymous. However, Smith does not dispute that both callers gave their first names and an

address, and that one caller gave his phone number to 911; rather, Smith asserts that such

information did not relieve the callers of their anonymity. The Seventh Circuit has "repeatedly

rejected this argument" and held that once a caller gives 911 her name, she has identified herself

and is not anonymous. *Fields*, 373 F. App'x at 627 (citations omitted); *see Hicks*, 531 F.3d at

559 (finding that a caller is not anonymous if he provides a name, location, a description of

clothing). The point of providing identifying information is to hold the 911 callers accountable,

and thereby increase the reliability of their tips. *See J.L.*, 529 U.S. at 270; *Wooden*, 551 F.3d at

649. ("Knowing a tipster's name increases the chance that he can be held accountable (both state

and federal governments make it a crime to tell material lies to law-enforcement officials), and

knowledge that a tipster has inside information likewise increases the chance that the report of

crime is accurate."); *Hicks*, 531 F.3d at 559 (noting "the reliability of a known tipster whose

reputation can be assessed and who can be held responsible if her allegations turn out to be

fabricate" (citation and internal quotation marks omitted)). That is exactly what happened here

as one of the 911 callers provided enough information for Officer Wilkins to follow up and

interview her. (Tr. 66-67). Therefore, I CONCLUDE that the 911 callers were not anonymous

and were reliable.

---

[6] Smith also argues that the 911 calls did not confer probable cause to arrest him. However, as will be discussed *infra*, Smith was not under *de facto* arrest at the start of the encounter and so I do not reach the issue of whether the calls conferred probable cause.

Further, the Seventh Circuit has held that, "reports of ongoing emergencies made in 911 calls are subject to less testing in court than other out-of-court statements." *Hicks*, 531 F.3d at 559-60 (citing *Davis v. Washington*, 547 U.S. 813, 827-28 (2006)); *see Whitaker*, 546 F.3d at 910 (finding that "the police had the right to detain the occupants of the car long enough to ascertain whether the situation described by the callers was still an ongoing threat"). Here, both callers described an ongoing emergency that required immediate dispatch: an intoxicated suspect was waiving a gun, threatening people in the area, and stating that he would return. Reporting such activity was sufficient to create reasonable suspicion for the officers to conduct an investigatory stop of an individual matching the suspect's description without "require[ing] further pre-response verification . . . ." *Whitaker*, 546 F.3d at 909; *see Wooden*, 551 F.3d at 650 ("When a crime is in progress, prompt action is essential."). Therefore, the information in the 911 calls is presumed to be reliable because the 911 callers identified themselves "and specifically describe[d] a disturbance that pose[d] a potential threat to public safety." *Fields*, 373 F.App'x at 627 (citing *Drake*, 456 F.3d at 775); *see also Wooden*, 551 F.3d at 650 ("A 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress.").

Smith's next argument is that the information contained in the 911 calls did not "provide[] sufficient details to allow the officers to identify the suspect[]." *Drake*, 456 F.3d at 775. Whether the officers' observations sufficiently corroborated the details in the police dispatch and 911 calls is considered in the totality of the circumstances. *See Whitaker*, 546 F.3d at 911; *Lenoir*, 318 F.3d at 729 (citing *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996)). Again, because the 911 callers reported an ongoing emergency, the situation permitted the

11

officers to utilize "a lower level of corroboration before conducting a stop . . . ." *Hicks*, 531 F.3d at 559 (citations omitted); *see Carr*, 2015 WL 362089 at *4 ("The caller's immediate report of a gun makes the information more reliable, as 'contemporaneous report[s]' have 'long been treated as especially reliable' under the law." (alteration in original) (quoting *Navarette v. California*, 134 S.Ct. 1688, 1683 (2014)).

When Officer Vachon commanded Smith to stop, the officers had received the following information regarding the suspect in the 911 calls:  a black male, in blue jean shorts and a white t-shirt[7] with a Bulls logo, walking a dog, intoxicated, traveling east bound on Brown Street towards Brooklyn Avenue, and threatening people in the area with a gun.  Smith claims that the officers could not have reasonably believed he fit this description when they commanded him to stop because:  Smith's shirt was white and grey, Smith was wearing blue jean pants not shorts, the officers could not see the Bulls logo on the front of his shirt, the officers could not detect any of the normal indicia of intoxication, and the officers did not know which direction Smith had come from.[8]

Keeping in mind the lower level of corroboration required for 911 calls reporting an ongoing emergency, the officers' observations and the dispatch descriptions were sufficient to confer reasonable suspicion that Smith was the suspect in the 911 calls.  It is uncontested that the officers observed Smith, a black male, walking a dog in the same geographic area and same time

---

[7] Smith assumes that the officers were looking for a suspect in a white shirt.  (DE 29 at 13).  To this point, Detective DeShaies could not recall if he had received the second dispatch describing the suspect's shirt as white and grey when he began following Smith in the alleyway.  (Tr. 89).

[8] Smith makes much of the fact that he was between 50 and 100 feet away from the officers when Officer Vachon ordered him to stop and argues that from 100 feet, the officers could not see if he was black.  However, all the officers testified that they saw Smith prior to ordering him to stop and none testified or were asked whether they could see if Smith was black.  Further, Officer Vachon testified that he saw a black male with a light colored shirt enter the alleyway.  (Tr. 11).  Therefore, Smith's argument that the officers could not see if he was black is unpersuasive.

as the reported emergency. *See Lenoir*, 318 F.3d at 729 (citation omitted). The officers were not required to corroborate *all* but only "*some* of the call's details, . . . to justify a brief investigatory stop because brandished guns create a risk of violence." *Fields*, 373 F. App'x at 628 (emphasis added); *see also United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004). Moreover, it is easy to imagine that from a distance of 50 to 100 feet, blue jean shorts could look similar to long blue jean pants, and a grey and white shirt may appear white. Therefore, Smith's argument that he did not sufficiently resemble the suspect described in the 911 calls fails.

Smith also argues that he was merely walking his dog at night when the officers saw him, and that such innocent conduct could not give rise to reasonable suspicion. However, it is well established that "behavior that is innocent in isolation may in a particular context give rise to a reasonable suspicion." *Maclin*, 313 F. App'x at 889 (citing *Lawshea*, 461 F.3d at 859); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007). Also, Smith's attempt to avoid the officers after seeing Officer Vachon provided additional suspicion to perform a *Terry* stop. *Lenoir*, 318 F.3d at 729 (citing *Wardlow*, 528 U.S. at 124; *Quinn*, 83 F.3d at 921).

Considering the totality of the circumstances, I CONCLUDE that the officers had reasonable suspicion to perform a *Terry* stop on Smith and were not confronted "with any reason to doubt" that Smith was the suspect described in the 911 report. *Drake*, 456 F.3d at 775.

### 2. The Officers Did Not Exceed the Scope of the Stop

Having found that the officers had at least reasonable suspicion to justify an investigatory stop, the next issue is whether the officers' actions were reasonable under the circumstances. *Weaver*, 8 F.3d at 1244. "Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest[,] and a *de facto* arrest." *Tilmon*, 19 F.3d at 1224; *see*

*Matz v. Klotka*, 769 F.3d 517, 525 (7th Cir. 2014) (citations omitted). "A *Terry* stop may be transformed into a formal arrest requiring probable cause if an officer's use of force is sufficiently disproportionate to the purpose of the stop—which may include ensuring the safety of the officers or others—in light of the surrounding circumstances." *Matz*, 769 F.3d at 524-25 (citations omitted). "[U]sing handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (citation omitted). "[T]he crux of [the] inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (citing *United States v. James*, 40 F.3d 850, 875 (7th Cir. 1994)); *see Matz*, 769 F.3d at 535 ("The investigation following a *Terry* stop must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." (citations and internal quotation marks omitted)). "In determining whether the degree of intrusiveness of an investigatory stop was objectively reasonable, [courts] consider whether the suspect's own actions in resisting the legitimate efforts of police to stop and question him played a role in bringing about the challenged police conduct." *Weaver*, 8 F.3d at 1243 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Tom v. Voida*, 963 F.2d 952, 958-59 n.6 (7th Cir. 1992)).

Smith claims that he was *de facto* arrested from the beginning of the encounter because he was commanded to stop, the officers threatened him and his dog, and all four officers approached him with their guns drawn and pointed at him. Smith also argues that the officers did not ask questions typical of an investigatory stop before detaining him. For the reasons

14

discussed below, I FIND that Smith was not *de facto* arrested and that his Fourth Amendment

rights were not violated.

First, the officers did not aim their weapons at Smith from the start of the encounter.

Officer Vachon and Officer Wilkins approached with their guns in a "low ready" position. (Tr.

32, 43). Detective DeShaies approached with his shotgun pointed at the ground. (Tr. 92). As

Detective DeShaies got closer he trained his shotgun on Smith's dog, which was barking

aggressively at the officers. (Tr. 75). Officers Vachon and Wilkins testified that when Smith did

not comply with the officers' commands to tie up his dog and keep his hands away from his

pocket, they may have aimed their weapons at Smith. (Tr. 33, 59). Under these circumstances—

that is, the officers were confronted with an individual that they believed was armed and

dangerous, appeared intoxicated, with an aggressive dog, and was resisting their instructions—

they were permitted to aim their guns at Smith due to a "legitimate fear for personal safety."

*Matz*, 769 F.3d at 526. Therefore, it was not unreasonable for the officers to draw their weapons

and train them on Smith "to safely effect the stop." *Id*. (citing *Lawshea*, 461 F.3d at 860).

Second, the officers did not exceed the scope of the stop by proceeding without first

asking Smith any questions typical of an investigatory stop. Detective DeShaies testified that the

officers would have conducted an interview with Smith but his lack of cooperation prevented this

from taking place. Indeed, from the outset of the encounter Smith argued with the officers,

exhibited indicia of intoxication, and did not adhere to their instructions. Thus, the officers did

not ask Smith any questions because of Smith's "own actions in resisting [the] officer[s']

efforts." *Jewett v. Anders*, 521 F.3d 818, 825 (7th Cir. 2008) (citations and internal quotation

marks omitted).

Third, even after Smith placed the dog's leash around a pole, he persisted in not

15

complying with the officers' orders.  The officers testified that Smith hesitated in coming closer

to them and away from his dog, creating a barrier between himself and the officers.  Further,

Smith failed to adhere to the officers' orders to keep his hands on his head and dropped them to

his side multiple times.  The officers reasonably considered Smith to be a danger to them and to

himself.  *See id* at 825 ("Officer Anders had been advised that Thompson could be armed, and he

reasonably considered Thompson to be dangerous to himself, his partner and others.").

Moreover, the officers could see the outline of a pistol grip in Smith's left front pant pocket,

where Smith's left hand was dropping despite numerous warnings not to do so.  At that point,

Officer Shefferly tased Smith.  Given the circumstances of the encounter that posed a threat to

the officers, I FIND that the use of a taser was "appropriate to accomplish the purpose of [the]

investigatory stop," *Weaver*, 8 F.3d at 1244 (alteration in original), and "did not convert the

encounter into a full arrest."  *Jewett*, 521 F.3d at 826-27 (footnote omitted).

Because the officers had reasonable suspicion to believe that Smith was armed, and

because the officers did not exceed the scope of an investigatory stop, the officers' pat down of

Smith's exterior did not violate his Fourth Amendment rights.  Moreover, the officers testified

that Smith's behavior—that is, his slurred speech, swaying and unsteady posture, stumbling, and

his failure to appreciate the situation he was in—provided probable cause to arrest Smith for

public intoxication.  Once the officers were closer to Smith, they could also smell the heavy odor

of alcohol on him.  The Government argues that by the time Officer Wilkins gained physical

control Smith, there was probable cause to arrest Smith for public intoxication.[9]  Smith does not

meaningfully respond to the Government's argument, and merely asserts that he was trying to

---

[9] Under Indiana law, a person commits the offense of public intoxication when he is "in a public place or a place of public resort in a state of intoxication caused by the person's use of alcohol or controlled substance," if the person "(1) endangers the person's life; (2) endangers the life of another person; (3) breaches the peace or is in imminent danger of breaching the peace; or (4) harasses, annoys, or alarms another person."  Ind. Code § 7.1-5-1-3.

16

de-escalate the situation and calm the officers down before tying up his dog. As discussed *supra*, Smith's argument is inconsistent with evidence in the record. Therefore, I CONCLUDE that Officer Wilkins's frisk of Smith was lawful because the officers had reasonable suspicion to believe that Smith was armed and because the officers had probable cause to perform a search incident to an arrest.

3.  <u>Smith Has Not Shown Grounds for Suppressing Evidence of the Pistol</u>

Finally, the Government argues that, in any event, the Court should not suppress evidence of the Smith and Wesson 40 caliber pistol because it was not discovered as a result of a search of Smith's person. As Smith admitted in a phone call to his girlfriend, he threw the gun away before the officers commanded him to stop. It is well established that an individual is not seized until he submits to a show of authority by law enforcement or law enforcement forces him to submit. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991); *United States v. Mays*, 819 F.3d 951, 956 (7th Cir. 2016) ("[A] fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority." (citation and internal quotation marks omitted)). Because Smith had not submitted to the officers when he abandoned the pistol, it could not be the fruit of an unlawful search or seizure even if the officers had violated Smith's Fourth Amendment rights, and therefore, I CONCLUDE that Smith has not shown any grounds for suppressing evidence of the pistol.

**IV.  CONCLUSION**

For the above reasons, I CONCLUDE that Smith's Fourth Amendment rights were not violated as to warrant suppressing the evidence in this case. I therefore RECOMMEND that Smith's motion to suppress all evidence (DE 20) be DENIED.

17

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations.  Fed. R. Crim. P. 59(b)(2).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 7th day of March 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge